433 S.E.2d 268

**Karen E. DAWSON, Plaintiff Below, Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, A Foreign Corporation, and Ralph Burton, Defendants Below, Appellees.**

**No. 21492.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1993.

Decided July 16, 1993.

558 

Barbara H. Lupton, Masters & Taylor, L.C., Charleston, for appellant.

Ricklin Brown, Elizabeth D. Harter, Bowles Rice McDavid Graff & Love, Charleston, for appellees.

PER CURIAM:

This case is before the Court upon the appeal of Karen E. Dawson, the plaintiff below, from the June 9, 1992 order of the Circuit Court of Kanawha County which granted summary judgment for the appellees and defendants below, Allstate Insurance Company and Ralph Burton. Ms. Dawson brought this action against the appellees alleging that the appellees had refused to hire her as an insurance agent solely on the basis of her gender in violation of *W. Va. Code*, 5–11–9 [1989].[1] Ms. Dawson also alleged that the appellee, Ralph Burton, made false representations to her about getting the job upon which she detrimentally relied. For reasons set forth below, we hold that the granting of summary judgment was proper in Ms. Dawson's false misrepresentation action, and improper in Ms. Dawson's gender discrimi-

---

**1.** *W. Va. Code,* 5–11–9 was amended in 1992; however, the amendments do not affect the issue in this case.

nation action. Therefore, we affirm, in part, and reverse, in part, and remand this case to the circuit court for proceedings consistent with this opinion.

## I

The appellee, Ralph Burton, supervises agents and has the responsibility of hiring agents in West Virginia for Allstate Insurance Company (hereinafter Allstate). Mr. Burton was actively recruiting two Allstate agents in the summer of 1988. In June of 1988 Ms. Dawson, the appellant, applied for one of the positions. There were at least two other people who applied for the positions: Patrick Reynolds and James Matthews. Eventually, Mr. Reynolds was hired for one of the agent positions. Mr. Matthews decided not to pursue the job, and Ms. Dawson was not offered a position.

Mr. Burton stated that although there is not a list of absolute standards which indicate that a person is qualified to be a sales agent, there were qualities that he looked for when determining whether a person would be successful as an agent. For instance, he stated that Allstate preferred that the applicant has a college degree and that the applicant has some prior success pattern, preferably in sales. The applicant has to pass the TRACK test, a general aptitude test. The applicant should also like to win awards and have high monetary goals. Mr. Burton states that competitiveness is important, and one way he checks to see if the applicant is competitive is to find out whether the applicant played sports in college or competes in races. The applicant also has to work well with people and have a professional image.

During his deposition, Mr. Burton outlined the general procedure he used when considering an applicant for a position with Allstate. First, the applicant takes the TRACK test. Second, Mr. Burton interviews the applicant. Third, the applicant completes work samples which gives the applicant an idea of what the job entails by having the applicant contact people about their auto and homeowner's insurance. Fourth, the applicant observes the job.

Fifth, the applicant is interviewed by the Territorial Sales Manager, John Rushe, or the Territorial Sales Development Manager, Charlie Landen. Sixth, the applicant must obtain an insurance license.

Ms. Dawson completed the entire procedure outlined by Mr. Burton with the exception of obtaining an insurance license. Ms. Dawson passed the TRACK test and interviewed with Mr. Burton. Ms. Dawson stated that during the interview Mr. Burton asked her why she was not pursuing a teaching career. Mr. Burton admits that he questioned Ms. Dawson about a teaching career. Mr. Burton also told Ms. Dawson that he would need to meet with her children in order to make sure that they understood the demands of an agent's job. The appellees point out that the Allstate manual suggests that the family be involved in the interview process in order to make sure they understand the commitment of an agent.

Ms. Dawson also stated that she gave Mr. Burton her schedule for the summer since she would be out of town throughout the summer taking classes in order to complete her master's degree. Mr. Burton does not recall Ms. Dawson giving him the schedule. Ms. Dawson alleges that even though Mr. Burton had her schedule, he nevertheless sent her work samples to be completed in two days when he knew that she would not receive the forms until a week after they were due since she was out of town.

Ms. Dawson completed the first set of work samples which involved calling people and asking about their insurance. The purpose of the work samples is to give the candidate a feel for calling strangers to solicit insurance business.

Ms. Dawson then interviewed with Mr. Rushe. Ms. Dawson stated that Mr. Rushe told her that as far as he was concerned she had the job, but it was Mr. Burton's decision. In his affidavit, Mr. Rushe stated that he did not tell Ms. Dawson that the job was hers. Mr. Rushe did ask Ms. Dawson to complete 30 additional work samples since she had called 30 acquaintances when doing the first set of work samples which

would not give Ms. Dawson an indication of what it is like to call strangers. Mr. Rushe also stated in his affidavit that he asked Mr. Burton to have her complete an Annual New Business Income/Sales Projection form since he had concerns about whether Ms. Dawson comprehended the amount of work she would need to complete in order to reach her monetary goal.

Ms. Dawson was given the Annual New Business Income/Sales Projection form to complete. Mr. Burton stated that he explained how the form was to be completed. Ms. Dawson stated that Mr. Burton did not explain how to do the form, so she asked her ex-husband, who was an insurance agent, how to complete the form. Mr. Burton stated that after she completed the form, he had her explain it to him and she could not. Mr. Burton stated that Mr. Reynolds was not asked to complete the Annual New Business Income/Sales Projection form nor was he asked to do thirty additional work samples. Mr. Reynolds stated in his affidavit that he was required to complete the Annual New Business Income/Sales Projection form.

Ms. Dawson did observe agents at the Allstate booth located in the Town Center mall. Mr. Burton stated that the agents who were working in the booth on the day Ms. Dawson observed did not make any comments regarding Ms. Dawson when usually they will say that they think a candidate would be a good agent. Mr. Burton also stated that one agent at the booth stated that it was her understanding that Ms. Dawson was not motivated to work.

Ms. Dawson stated that she told Mr. Burton that she would get her insurance license after she was hired. Mr. Burton stated that obtaining a license is a prerequisite to getting the job. However, Ms. Dawson stated that Mr. Reynolds was hired before he obtained his license, though

Mr. Burton denies that Mr. Reynolds was offered a job before he had obtained his insurance license.

Ms. Dawson stated that Mr. Burton told her that he could not offer her a job because there were three other people, who were men, who were more qualified than she was. Ms. Dawson also stated that Mr. Burton said that he could not offer her a position because she did not have a track record. Mr. Burton gave the following reasons for not hiring Ms. Dawson: concern about whether Ms. Dawson understood what it took to perform the job; the lack of comments by agents at the booth about Ms. Dawson after Ms. Dawson's observation; the less than satisfying job references of Ms. Dawson (though Mr. Burton never actually spoke with any of Ms. Dawson's references); Ms. Dawson's failure to obtain her agent's license; the concern about her lack of initiative in pursuing a full-time teaching position or working as a solicitor [2] in her ex-husband's insurance agency; the wearing of a dress by Ms. Dawson which did not appear appropriate for the job (looked like a dress you would wear to a dinner party according to Mr. Burton); the fact that Ms. Dawson got upset when the interview dates were mixed up and when he was going over the Annual New Business Income/Sales Projection form; and what appeared to be lack of good judgment by Ms. Dawson. Mr. Burton stated that he told Ms. Dawson that Allstate did not have a position for her only after she demanded to know whether or not she had the job.

Ms. Dawson filed a complaint alleging that the appellees had not hired her solely on the basis of her gender, and that Mr. Burton had made false representations to her about getting the job upon which she detrimentally relied. The appellees filed a motion for summary judgment on July 30, 1990. Ms. Dawson did not respond to the motion for summary judgment. On June 9,

---

**2.** The following is a general description of the difference between an agent and a solicitor:

A 'general' agent is ordinarily one who is authorized to accept risks, to agree upon and settle terms of insurance contracts, to issue policies of insurance, to renew policies, and to change, modify, or vary the terms of exist-

ing contracts, as distinguished from a 'soliciting' agent, who merely procures applications, forwards them to other officers of the insurer, collects premiums, and delivers policies.

16 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 8696, at 274 (1981) (footnote omitted).

1992, the circuit court granted the appellees' motion for summary judgment. The circuit court had before it the pleadings, the depositions of Mr. Burton and Ms. Dawson, the affidavits of Mr. Rushe and Mr. Reynolds, and the appellees' answer to the appellant's interrogatories and request for the production of documents. It is from the circuit court's granting of the motion for summary judgment that Ms. Dawson appeals.

## II

■ We first address Ms. Dawson's contention that she established a prima facie case of gender discrimination under *W. Va. Code*, 5–11–9 [1989] precluding summary judgment. We agree with Ms. Dawson.

*W. Va. Code*, 5–11–9(a)(1) [1989] states, in part, that "[i]t shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required[.]" "The term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, *sex*, age, blindness, handicap, or familial status and includes to separate or segregate[.]" *W. Va. Code*, 5–11–3(h) [1989] (emphasis added).[3] These two code sections in the West Virginia Human Rights Act are the basis of Ms. Dawson's gender discrimination claim.

■ In syllabus point 2 of *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986) we stated that in order "[t]o successfully defend against a motion for summary judgment, the plaintiff must make some showing of fact which would support a prima facie case for his claim." Furthermore, in syllabus point 3 of *Conaway, supra*, we outlined what the plaintiff must show in order to make a prima facie case in an employment discrimination action:

In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5–11–1 *et seq.* (1979), the plaintiff must offer proof of the following:

(1) That the plaintiff is a member of a protected class.

(2) That the employer made an adverse decision concerning the plaintiff.

(3) But for the plaintiff's protected status, the adverse decision would not have been made.

In the case before us, Ms. Dawson has satisfied the first two requirements of proving a prima facie case: she is a woman, and she was not hired by Allstate. It is the third requirement that is in dispute.

■ This Court noted in *Conaway* that it is unlikely that a plaintiff will have direct proof of the third requirement. Therefore, direct proof is not necessary.

The first two parts of the test are easy, but the third will cause controversy. Because discrimination is essentially an element of the mind, there will probably be very little direct proof available. Direct proof, however, is not required. What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that members of the protected class received substantially worse treatment than others.

*Id.* at 170–71, 358 S.E.2d at 429–30. Therefore, all Ms. Dawson has to show in order

---

**3.** *W. Va. Code*, 5–11–3 was amended in 1992; however, the amendments do not affect our discussion.

to meet the third requirement is an inference that the decision to not hire her was based on gender.

Ms. Dawson points to several pieces of evidence in order to give rise to an inference that Allstate's decision to not hire her was based on gender. In her deposition Ms. Dawson stated that Mr. Burton asked her on at least three occasions why she did not pursue a teaching job. Historically, teaching has been considered a good career for women with children. Ms. Dawson contends that Mr. Burton was implying that teaching was more suited for women. Ms. Dawson had a teaching degree, and she had substituted over a period of approximately ten years. Mr. Burton admits that he asked her about a teaching career and about becoming a solicitor. He states that the fact that she did not attempt to obtain a teaching job or apply for a solicitor's job showed a lack of initiative since Ms. Dawson stressed that she needed a job.[4]

Mr. Burton also informed the appellant that he would have to meet with her children in order to make sure they understood the long hours of an agent. The appellees point out that the Allstate manual requires potential agents' families to be involved in the interview because of the long work hours.

Mr. Burton stated that he thought an applicant's participation in sports was a big plus since it demonstrates aggressiveness.

Mr. Burton also states that he gives heavy weight to successful prior work experience. Ms. Dawson argues that these two criteria put women at a disadvantage.

The defendants' answer to the plaintiff's interrogatories indicate that out of forty-nine agents in West Virginia, four were women in 1988, and out of fifty-one agents in West Virginia, five were women in 1989. We noted in *Conaway, supra,* that since it is unlikely that a plaintiff will have direct proof of discrimination, the plaintiff can use statistical evidence which indicates that members of the protected class were treated worse than others as evidence of discrimination. Therefore, we find the statistical gender disparity which exists to be relevant to whether Ms. Dawson has established a prima facie case of gender discrimination.

Ms. Dawson states that she was told that she did not have a proven successful employment history, and that the other applicants, who were men, were more qualified than she. Ms. Dawson points out that Mr. Burton never spoke with any of her references, who had been past employers. Ms. Dawson also points out that she had several part-time jobs while her children were small. However, Mr. Reynolds, who was eventually hired as an agent, had just graduated from college and had only worked as

---

**4.** Following is a portion of Mr. Burton's testimony:

Q. Can you name one thing for me right now that would indicate to you that she [Ms. Dawson] lacked initiative, based on your interviews, based upon any of your interview process, testing or whatever, other than what this Teresa girl said that would demonstrate to you that she lacked initiative?

A. [Mr. Burton:] There was a question that I had regarding why she did not work or had not pursued, which I had talked to her about in the last two meetings I had with her, why she had not pursued a solicitor's job with either Jim or another agent where she could probably well have worked part-time and worked around the children, too, at that time. In other words, the job could have been fit in most offices where she could have worked around her children's hours. That I was wondering about.

Q. That showed you a lack of initiative that she didn't want to work as a solicitor?

A. [Mr. Burton:] Yes, I was wondering why she did not pursue a solicitor's job if she wanted to get in sales.

Q. Wasn't she working part-time as a teacher, substitute teacher?

A. [Mr. Burton:] Yes, but still, you could even work—when you're not teaching, you could work as a solicitor on your days when you're not teaching. It's pretty flexible to be a solicitor, you know, if you've got an agent that would be agreeable with it.

Q. So besides the fact that she wasn't a part-time solicitor along with being a part-time school-teacher, was there anything else besides Teresa's comment that led you to believe that she lacked initiative?

A. [Mr. Burton:] Well, the fact that she did not get an agent's license, did not pursue that, and the fact that she did not pursue getting a full-time teaching position.

a solicitor in his father's insurance business.

The appellees point out that once a prima facie case is established, then the employer, if it can, offers a legitimate nondiscriminatory reason for the employment decision. The plaintiff must then show that the offered nondiscriminatory reason was merely pretextual.[5] *See* syl. pt. 4, *Conaway, supra.* The appellees state that they have given a legitimate nondiscriminatory reason for their failure to hire Ms. Dawson, so she must show that the legitimate nondiscriminatory reason they offered was pretextual in order to survive a motion for summary judgment. We disagree. In syl. pt. 2 of *Conaway, supra,* we made it clear that all a plaintiff must do to survive a motion for summary judgment is to establish a prima facie case. To hold otherwise would put an unfair burden on the plaintiff since there is often little direct evidence of discrimination. The decision of whether there is discrimination rests with the jury's determination of the motive or intent behind the actions of the parties.

Therefore, Ms. Dawson established a prima facie case since the above facts give rise to an inference that gender played a role in Allstate not hiring Ms. Dawson for the position. Furthermore, summary judgment is not proper in complex cases which involve motive or intent. 6 James W. Moore & Jeremy C. Wicker, *Moore's Federal Practice* ¶ 56.16 (1993). *See also Karnell v. Nutting*, 166 W.Va. 269, 273 S.E.2d 93 (1980). While it is not clear that the above facts will enable Ms. Dawson to prevail at trial, the facts do enable Ms. Dawson to survive a motion for summary judgment.

### III

Next, we address whether summary judgment was appropriate in Ms. Dawson's fraudulent misrepresentation claim. Although Ms. Dawson mentions in her petition for appeal, which is also her brief, that count two of her complaint was a fraudulent misrepresentation claim, Ms. Dawson does not discuss nor argue in her petition for appeal what evidence is in the record to support her fraudulent misrepresentation claim.

In syllabus point 3 of *Higginbotham v. City of Charleston*, 157 W.Va. 724, 204 S.E.2d 1 (1974) *overruled on other grounds, O'Neil v. City of Parkersburg*, 160 W.Va. 694, 237 S.E.2d 504 (1977), we held that assignments of error which are not argued in the briefs will be deemed waived. Therefore, the circuit court correctly granted summary judgment on Ms. Dawson's fraudulent misrepresentation claim.

### IV

Last, we address the appellees' contention that the circuit court properly granted the appellees' motion for summary judgment because Ms. Dawson failed to respond to the motion for summary judgment. The appellees point out that Ms. Dawson had two years from the time they filed the motion for summary judgment until the circuit court granted the motion to respond; however, Ms. Dawson failed to respond to the motion for summary judgment.

The appellees point to *W.Va.R.Civ.P.* 56(e), which states, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The appellees also point to syllabus point 2 in *Guthrie v. Northwestern Mutual Life*

---

**5.** Although not at issue in the case before us, we point out that the Supreme Court of the United States recently held that even if the plaintiff shows that the employer's nondiscriminatory reasons for its actions are pretextual the plaintiff is not entitled to judgment as a matter of law since the ultimate burden of persuasion remains with the plaintiff. *St. Mary's Honor Center v. Hicks*, — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Ins. Co.*, 158 W.Va. 1, 208 S.E.2d 60 (1974) which states:

> Under the provisions of Rule 56 of the West Virginia Rules of Civil Procedure, when the moving party presents depositions, interrogatories, affidavits or otherwise indicates there is no genuine issue as to any material fact, the resisting party to avoid summary judgment must present some evidence that the facts are in dispute.

The appellees contend that since Ms. Dawson did not respond to the motion for summary judgment, then the circuit court correctly granted the appellees' motion for summary judgment. We disagree.

 Although syllabus point 2 in *Guthrie* does state that the nonmoving party must present evidence that the facts are in dispute, syllabus point 2 also states that the moving party's evidence must show that there is no genuine issue of material fact. *See also Crain v. Lightner*, 178 W.Va. 765, 364 S.E.2d 778 (1987). In syllabus point 5 of *Aetna Casualty & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963) we made it clear that "[t]he question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Furthermore, in syllabus point 6 of *Aetna Casualty & Sur. Co., supra,* we pointed out that "[a] party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment."

Therefore, in the case before us the appellees have the burden of proving that there is no genuine issue of fact. If the appellees fail to prove that there is no genuine issue of material fact, then there is no need for Ms. Dawson to respond.

The Fourth District Court of Appeal of Florida pointed out that it is not necessary for the non-moving party to respond if the moving party fails to show that there is no genuine issue of fact:

> Much of the argument in the briefs deal with the contention that the party moved against must file a counter-affidavit or suffer summary judgment. This, of course, is not correct. If the court file contains other competent proof such as depositions, admissions, or answers to interrogatories, which contradicts the moving party's claim, it is not necessary for the non-moving party also to file an affidavit to counter the movant's affidavit. That is not to say that good practice may not often suggest also filing an affidavit so as to point up the contradicting statements which may be buried throughout a voluminous court file.

*Miscal Construction Co., Inc. v. Rusco Industries, Inc.*, 403 So.2d 607, 608 (Fla. Dist.Ct.App.1981). *See* 6 James W. Moore & Jeremy C. Wicker, *Moore's Federal Practice* ¶ 56.22[2] (1993).

In the case before us, the circuit court had before it the pleadings, two depositions, answers to interrogatories, and two affidavits. The evidence before the circuit court did show that there is an issue of fact. Allstate had hired more men than women to be agents in West Virginia. Mr. Burton admits that he asked Ms. Dawson why she did not pursue a teaching career. Whether Mr. Burton's question about teaching shows gender discrimination is a question for the jury since it involves motive.

 It has been pointed out that "although there may be no dispute as to the basic evidentiary facts, summary judgment is improper where the case stands or falls on the inference that may be drawn from these facts—particularly, where the inferences depend upon subjective feelings and intent." *Dalesio v. Allen–Bradley Co.*, 64 F.R.D. 554, 556 (W.D.Pa.1974) (citing cases). Furthermore, we have stated that "[e]ven if the trial judge is of the opinion to direct a verdict, he should nevertheless ordinarily hear evidence and, upon a trial, direct a verdict rather than try the case in advance on a motion for summary judgment." Syl. pt. 1, *Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433 (1980).

Therefore, since the case before us involves motive and intent and since the appellees have failed to show that there is no

genuine issue of fact, summary judgment should not have been granted on the issue of gender discrimination even though Ms. Dawson failed to respond to the motion for summary judgment.

### V

Accordingly, we hold that the granting of summary judgment was proper in Ms. Dawson's false misrepresentation action, and improper in Ms. Dawson's gender discrimination action. Therefore, we affirm, in part, and reverse, in part, and remand this case to the circuit court for proceedings consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded.